UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KARL MECHE                                                    CIVIL ACTION

VERSUS                                                        NO. 18-3995

METROPOLITAN LIFE INSURANCE CO.              SECTION "R" (5)


**FINDINGS OF FACT AND CONCLUSIONS OF LAW**


## I.     INTRODUCTION

This case arises from the denial of long-term disability benefits.[1]
Plaintiff claims that he suffered a back injury at work,[2] but that MetLife—his
ERISA plan issuer[3]—has not provided long-term disability benefits.[4]
Specifically, plaintiff alleges that MetLife denied his claim due to a pre-
existing condition.[5]  Plaintiff now seeks past and future benefits, as well as
interest, fees, and costs.[6]  The Court has jurisdiction over this matter under
29 U.S.C. § 1132(e).  The parties agreed to try this case on the briefs.[7]  After

---

[1]     *See* R. Doc. 1.
[2]     *See id.* at 1 ¶ 7.
[3]     *See id.* at 1 ¶ 3.
[4]     *See id.* at 2 ¶ 8.
[5]     *See id.*
[6]     *See id.* at 3-4.
[7]     *See* R. Doc. 9; R. Doc. 11.

reviewing the administrative record[8] and the parties' trial briefs and exhibits,[9] the Court rules as follows.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties contest whether plaintiff should receive long-term disability benefits.  Making this determination requires the Court to answer two main questions:  (1) Does the policy preclude payment in general for a disability that results from a pre-existing condition?  (2) If so, did plaintiff's disability in particular result from a pre-existing condition?

### A.    The Plan

In order to answer these questions, the Court first summarizes the terms of the policy at issue.  Plaintiff Karle Meche worked for Air Liquide USA LLC.[10]  Air Liquide provides long-term disability insurance to eligible employees,[11] through its Group Benefits Plan.[12]  Metropolitan Life Insurance

---

[8]     R. Doc. 12.
[9]     R. Docs. 17, 18, 21.
[10]     *See* R. Doc. 12-1 at 96.
[11]     *See, e.g.*, R. Doc. 12-1 at 1-2, 27.  The insurance policy states that the eligible class is "[a]ll Full-Time employees."  *Id.* at 27 (emphasis removed).  Defendant does not appear to dispute that Meche was part of this eligible class.  *See* R. Doc. 18 at 2.
[12]     *See* R. Doc. 12-1 at 70.

Company insures these benefits.[13]  The Employee Retirement Income Security Act of 1974 applies to the administration of these benefits.[14]

The plan provides benefits to disabled individuals.  A disabled individual is one who, generally, "due to Sickness or as a direct result of accidental injury," cannot earn at the same level he did before the disability.[15] If a participant becomes disabled, the plan will pay as long-term disability benefits a portion of his predisability earnings,[16] until, roughly, the participant's retirement age.[17]

These payments begin only after an "Elimination Period."[18]  The Elimination Period is "the period of [the employee's] Disability during which [MetLife] do[es] not pay benefits."[19]  This period "begins on the day [the employee] become[s] Disabled,"[20]  and then continues for "[t]he greater of the Short Term Disability Maximum Benefit Period or 180 Days."[21]

The plan also contains a statement regarding pre-existing conditions. It states:

---

13      *See id.*
14      *See, e.g.*, *id.* at 73.
15      *See* R. Doc. 12-1 at 23-24.
16      *See id.* at 21.
17      *See id.* at 22, 41.
18      *See* R. Doc. 12-1 at 24.
19      *See id.*
20      *See id.*
21      *See id.* at 21, 24.

**DISABILITY INCOME INSURANCE: PRE-EXISTING CONDITIONS**

**Pre-existing Condition** means a Sickness or accidental injury for which You:

- received medical treatment, consultation, care, or services; or
- took prescribed medication or had medications prescribed;

in the 12 months before Your insurance, or any increase in the amount of insurance, under this certificate takes effect.

We will pay benefits, or any increase in benefit amount due to an elected increase in the amount of Your insurance, for a Disability that results from a Pre-existing Condition if Your Elimination Period starts after the earlier of the date You:

- have not received medical treatment, consultation or services for the Pre-existing Condition for 3 months following the date Your Disability insurance, or any increase in such insurance, takes effect under this certificate; or
- have been Actively at Work for 12 consecutive months after the date Your Disability insurance, or any increase in such insurance takes effect under this certificate.[22]

This provision, in other words, performs two functions. In the first section, it defines under what scenarios an employee will be deemed to have a pre-existing condition. Specifically, if an employee received medical treatment or prescriptions for a sickness or injury in the year before his insurance began, he will be considered to have a pre-existing condition. In

---

[22]    R. Doc. 12-1 at 43.

4

the second section, it identifies the scenarios in which MetLife will pay an employee benefits for a disability resulting from such a pre-existing condition. Specifically, MetLife will pay benefits if the employee became disabled after either having not received treatment for the pre-existing condition for three months after his insurance began, or having worked for a year after his insurance began.

Here, Meche's insurance began on December 7, 2015, and his disability started on July 21, 2016.[23] Pursuant to the first section, therefore, Meche had a pre-existing condition if, between the dates of December 7, 2014, and December 6, 2015, he received treatment or medication. And pursuant to the second section, MetLife would pay benefits—even if Meche's disability resulted from a pre-existing condition—if he had not received treatment for such a condition from December 7, 2015, through March 6, 2016.[24]

## B. The Claim

Having reviewed the contract language that applies to Meche's claim, the Court next summarizes MetLife's adjudication of his claim. Meche

---

[23]    R. Doc. 12-4 at 4.

[24]    Because Meche had not worked for a year after his insurance began, the "Actively at Work" condition does not apply. By default, therefore, the "not received medical treatment" condition supplies the earlier date that could trigger Meche's benefit eligibility.

worked for Air Liquide as an Account Manager.[25]  On July 20, 2016, Meche

suffered a back injury at work.[26]  He described the injury in the following

terms:

> I hurt my back while inspecting cylinders for the company.  I
> heard and felt a pop in my middle back and immediately felt
> burning pain.  The pain was located primarily in the bottom of
> my shoulder blade all the way down to my beltline on my left side.
> This type of pain was something I had not experienced before.
> The pain has persisted.  It is severe and the worst pain I have
> suffered from.[27]

Meche had a history of low back pain,[28] and had previously had surgery

at the L4-5 level of his spine.[29]  But Meche indicated that the workplace

injury affected a different area of his back.  Specifically, Meche claimed that

the incident resulted in a new injury to his upper lumbar spine at level L2-3,

manifested by a protruding disc and radiculopathy.[30]

The day after the incident, Meche took disability leave.[31]  He received

short-term disability benefit payments through January 20, 2017.[32]  But his

claim for long-term disability benefits was denied.[33]

---

[25]     R. Doc. 12-1 at 96.

[26]     *See id.*

[27]     R. Doc. 12-2 at 67.

[28]     *See, e.g.*, R. Doc. 12-4 at 29.

[29]     *See, e.g.*, R. Doc. 12-2 at 98.

[30]     *See* R. Doc. 12-4 at 145.

[31]     *See* R. Doc. 12-1 at 96.

[32]     *See* R. Doc. 12-5 at 15.

[33]     *See* R. Doc. 12-4 at 3.

MetLife initially denied Meche's claim for long-term disability based on treatment records discovered during a "Pre-Existing Condition investigation."[34] MetLife conducted this investigation because Meche was injured less than twelve months after his policy became effective.[35] As stated above, Meche's policy became effective December 7, 2015, and his last day at work was July 20, 2016.[36] The investigation, therefore, examined the twelve months before Meche's plan took effect—that is, the period between December 7, 2014, and December 6, 2015—in order to identify whether Meche had a pre-existing condition.[37]

MetLife identified in its denial letter five relevant episodes contained in Meche's medical file that, it claimed, provided evidence of a pre-existing condition: (1) On March 31, 2015, Meche saw Dr. Todd Peavy to receive, *inter alia*, pain medication for "Herniated Lumbar Disc, Cervicalgia, Herniated Cervical Disc and Lumbago."[38] (2) On October 7, 2015, Meche again received treatment from Dr. Peavy for "chronic lower back pain . . . [and] lumbar disc disease."[39] (3) On March 2, 2016, Dr. Peavy noted that

---

[34] *See* R. Doc. 12-4 at 4.
[35] *See id.*
[36] *See id.*
[37] *See id.*
[38] *See* R. Doc. 12-4 at 4.
[39] *See id.*

Meche was continuing his treatment, and a pharmacy report corroborated Meche's continued use of painkillers.[40]  (4) On August 11, 2016, Dr. Patrick Juneau noted that Meche had been on medication for "chronic lower back pain" since 2011, and had previously had back surgery at the L4-5 level.[41] (5) On January 16, 2017, Dr. Juneau noted that Meche's chronic back pain continued despite physical therapy and a steroid injection, and recommended that Meche "ultimately live with the baseline level of lower back pain or consider pursuing surgery at the L2-3 level."[42]

Based on these records, MetLife concluded that "although treatment may have been at various levels it is related to the underlying condition of multi-level degenerative disc disease and spinal canal stenosis."[43]  It stated:

> [Y]ou received medical treatment, consultation, care, or services; took prescribed medication or had medications prescribed in the 12 months before Your insurance, or any increase in the amount of insurance went into effect and continued to receive medical treatment, consultation or services for the Pre-existing Condition for 3 months following the date Your Disability insurance, or any increase in such insurance went into effect.[44]

---

[40]     *See id.*
[41]     *See id.*
[42]     *See id.*
[43]     R. Doc. 12-4 at 4.
[44]     *Id.*

As a result, MetLife determined that Meche's condition was pre-existing and, therefore, he was "not eligible for Long Term Disability benefits."[45]

Meche appealed this initial decision.[46] During the appeal, a MetLife nurse consultant reviewed Meche's claim.[47] The nurse noted the March 31, 2015, and October 7, 2015, doctor visits for low back pain that occurred in the twelve months before the effective date of Meche's policy.[48] The nurse also identified relevant records during the "three month treatment free period from December 7, 2015 through March 6, 2016."[49] Specifically, the nurse pointed to the March 2, 2016, doctor visit "that documented chronic low back pain."[50]

The review by the nurse went on to reference documents from after the date of Meche's injury. For instance, the nurse pointed to the August 17, 2016, imaging—a spinal X-ray and MRI—as "not[ing] a history of mid back pain."[51] The nurse also mentioned a proposed surgery at the L2-3 level.[52]

---

[45] *See id.* at 4-5.
[46] *See* R. Doc. 12-1 at 95.
[47] *See id.* at 96.
[48] *See id.*
[49] *See id.*
[50] *See id.*
[51] *See* R. Doc. 12-1 at 96.
[52] *See id.*; *see also id.* at 152.

Based on "the findings on MRI, the proposed surgery, and the fact that [Meche] was under care and treatment for chronic lumbar spine pain due to multilevel degenerative disc disease (DDD) throughout the lumbar spine," the nurse concluded that the issues presented "regarding the L2/L3 level of the spine . . . would be pre-existing."[53] The nurse acknowledged that Meche "stat[ed] his pain is from different areas and [is] new."[54] But the nurse asserted that "a person does not acquire DDD as a result of an injury."[55] Consequently, the nurse consultant opined:

> [A]lthough the pre-existing records do not specifically state thoracic sprain/pain . . . and although treatment may have been at various levels[,] the thoracic and upper lumbar conditions/pain are related to the underlying condition of multi-level degenerative disc disease and spinal canal stenosis and therefore would be considered pre-existing to your client's back pain.[56]

In short, therefore, the nurse consultant identified that Meche "was under treatment for chronic back pain," including doctor visits and medication, "during the pre-existing period . . . and the treatment free

---

[53]  R. Doc. 12-1 at 96.
[54]  *Id.* at 97.
[55]  *Id.*
[56]  *Id.*

period."[57]  Therefore, "his conditions [we]re considered pre-existing and as such [Meche] does not qualify for LTD benefits."[58]

Following the denial of his appeal, Meche filed the current suit.[59] Meche states that having "exhausted his administrative remedies," he now seeks in court to "reverse MetLife's denial of benefits."[60]

### C.    Legal Standard

Having summarized the plan and the claim, the Court now turns to its analysis of MetLife's decision to deny Meche long-term disability benefits. The Court has issued a companion order identifying its standard of review as *de novo*.[61]

### D.    Discussion

The Court first considers whether the policy language allows MetLife to deny benefits on the basis of a pre-existing condition.  The Court next considers how this language applies to plaintiff.

---

[57]    R. Doc. 12-1 at 97.
[58]    *Id.*
[59]    R. Doc. 1.
[60]    *Id.* at 2 ¶ 14.
[61]    R. Doc. 22.

## 1. Whether the Pre-Existing Condition Clause Has Force

Plaintiff argues that while the plan identifies when it *will* pay benefits based on a pre-existing condition, the policy does not state when it *will not* pay benefits based on a pre-existing condition.[62] In other words, plaintiff argues that the plan does not contain a "pre-existing condition exclusion."[63] Defendant, on the other hand, argues that the plan does not contain an *exclusion* but rather a *provision*.[64] In other words, the plan identifies when it will pay benefits based on a pre-existing condition, and therefore does not need to state when it will *not* pay benefits based on a pre-existing condition.[65] The Court finds that the pre-existing provision in the contract effectively delineates when an individual with a pre-existing condition is eligible for long-term disability payments.

"In construing ERISA plan provisions, we interpret the contract language 'in an ordinary and popular sense as would a person of average intelligence and experience,' such that the language is given its generally accepted meaning if there is one." *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (quoting *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448,

---

[62]  *See* R. Doc. 17 at 6.
[63]  *See id.*
[64]  *See* R. Doc. 18 at 8.
[65]  *See id.*

1451 n.1 (5th Cir. 1995)); *see also Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 725 (5th Cir. 2017). That said, "if the plan terms remain ambiguous after applying ordinary principles of contract interpretation," the Court will "apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured." *Wegner*, 129 F.3d at 818.

Reading the provision on pre-existing conditions as providing no limits on when the policy will pay benefits, as plaintiff advocates, fails to interpret the contract as an ordinary person would. An average person would understand this clause to mean that, in the scenarios defined, a pre-existing condition will not preclude payment. In addition, an "elementary rule[] of contract interpretation . . . require[s] courts to give meaning to each term, phrase, and provision of a contract." *Tenn. Gas Pipeline Co. v. F.E.R.C.*, 17 F.3d 98, 104 (5th Cir. 1994). But plaintiff's reading would require the Court read this entire section of the plan as surplusage. Plaintiff's reading thus violates both the plain language of the contract and the elementary principles of contract interpretation. The Court therefore finds, contrary to plaintiff's suggested gloss, that the contract allows MetLife to deny benefits based on pre-existing conditions.

Because the language of the provision is clear, the Court finds that it does not violate any requirement for exclusions to be express. *See Harris v.*

*Olympus Terminals & Transp. Co.*, 516 F.2d 922, 924 (5th Cir. 1975) ("If an exclusion is to take away what the insuring language provides, it must do so in unmistakably clear terms." (quoting *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 308 (5th Cir. 1973)). And even if the language were not clear, the Court would not find this heightened standard triggered, because—as defendant notes—the provision identifies the scenarios in which the plan will provide benefits despite a pre-existing condition, rather than excluding a participant from benefits as a result of a pre-existing condition. Overall, therefore, the Court finds that the clause at issue validly permits the denial of benefits based on a pre-existing condition.

### 2. *Whether Meche's Disability Resulted from a Pre-Existing Condition*

Plaintiff argues that because he suffered a "work-related injury involving a different area of his spine," the pre-existing condition provision in the plan does not apply.[66] Defendant responds that any treatment for this injury related to plaintiff's degenerative disc disorder and spinal stenosis that he had previously received treatment for, and thus his pre-existing condition prevented payment of benefits.[67] In short, therefore, the Court must determine whether under the plan terms, Meche's "Disability . . . results from

---

[66] *See* R. Doc. 17 at 9.
[67] *See* R. Doc. 18 at 11.

a Pre-existing Condition."[68]   The Court finds that the evidence does not support a conclusion that Meche's disability following his work-related injury resulted from a pre-existing degenerative disorder.

First, the Court notes that defendant does not dispute that plaintiff suffered a work-related injury.[69]   The medical evidence also reflects that plaintiff contemporaneously reported the accident and injury to his medical providers.  A medical form dated July 28, 2016, records that Meche suffered a work-related injury when he "[f]elt [his] [b]ack [p]op."[70]   And on August 11, 2016, one of Meche's treating doctors, Dr. Juneau, stated: "It is my impression that Karl Meche was injured on-the-job on July 20, 2016 while he was turning a cylinder while working for Air Liquid America."[71]   Dr. Juneau also later made a similar comment when he concluded on March 21, 2017, that Meche was "essentially at maximum medical improvement" following his "on-the-job accident that occurred on July 20, 2016."[72]

Second, the evidence reveals that this injury affected a new part of Meche's back.  Broadly, Meche's previous back problems were at the L4-5

---

[68]    *See* R. Doc. 12-1 at 43.
[69]    *See* R. Doc. 18 at 14.
[70]    *See* R. Doc. 12-3 at 185.
[71]    R. Doc. 12-2 at 99.
[72]    *See* R. Doc. 12-1 at 153.

level, but his injury affected the higher L2-3 level.[73]  Specifically, prior to his injury, Meche had undergone surgery at L4-5.[74]  He had an L4-5 spinal fusion in 2007, as well as a lumbar laminectomy and discectomy in 2011 at that level.[75]  There is no pre-accident evidence of problems at L2-3.

Following Meche's injury, a radiology report revealed that "[a]t L2-3," he had a "broad-based disc bulge."[76]  Dr. Juneau interpreted these MRIs as "show[ing] a disc protrusion off to the left at the L2-3 level with moderate spinal canal stenosis at L2-3 level."[77]  He reached a primary diagnosis from this imaging of "lumbar radiculopathy due to disc protrusion at L2-3."[78]  Dr. Peavy also concluded that Meche's symptoms are "consistent with the diagnosis he reported he received from Dr. Patrick Juneau."[79]

The ultimate diagnosis of injury to L2-3 also accords with the initial clinical findings made in advance of any imaging.  Dr. Juneau, for instance,

---

[73]    The vertebrae in the spine are identified by region (cervical, thoracic, lumbar, sacrum, and coccyx), and then by number within each region (with lower numbers being closer to the skull).  *See* R. Doc. 12-3 at 179.  The lumbar, or "low back" region, has five vertebrae numbered L1 to L5.  *See id.* Between the vertebrae are "intervertebral disc[s]," which act as cushions. *See id.* at 180.

[74]    *See, e.g.*, R. Doc. 12-1 at 100.

[75]    *See* R. Doc. 12-2 at 67, 98.

[76]    *See* R. Doc. 12-4 at 124.

[77]    *See id.* at 145.

[78]    *See id.*

[79]    *See* R. Doc. 12-1 at 100.

noted that Meche was diagnosed in the days after his injury as having a thoracolumbar strain.[80] Similarly, before ordering the MRIs, Dr. Juneau observed that there was "an area of soft tissue swelling and tenderness and spasm" on Meche's back, and that this area was above the incisions from Meche's previous surgeries.[81]

Third, these diagnostic findings also comport with Meche's symptoms. The location of Meche's pain changed after the accident. Before Meche's workplace injury, his pain was localized to his "lower lumbar spine around [his] belt-line."[82] He had "no thoracic spine pain."[83] Now, though, his "pain is primarily located higher than the pain [he] had before [his] injury."[84] It "radiates from the center of [his] back into [his] ribs and down [his] left leg."[85] Indeed, Dr. Juneau specifically identified Meche's discomfort as coming from the area above his prior back surgery.[86] And his physical therapist confirmed that the current pain has a different origin from Meche's prior pain, "due to location and description."[87]

---

[80]    *See* R. Doc. 12-2 at 98.
[81]    *See id.* at 98-99.
[82]    R. Doc. 12-2 at 67.
[83]    *Id.*
[84]    *Id.*
[85]    *Id.*
[86]    *See* R. Doc. 12-2 at 98-99.
[87]    *See* R. Doc. 12-1 at 110.

The severity of Meche's pain has also escalated. Before Meche's injury, he "only suffered from mild to minor pain in the lumbar spine, which [he] had been having since [his] 2007 surgery."[88] A doctor's report from March 31, 2015, for instance, notes that Meche's "back has been doing well."[89] Now, though, Meche's "pain is different from the mild pain that [he] had before [his] injury."[90] "It is severe and the worst pain [Meche] ha[s] suffered from."[91]

This increase in the severity of Meche's pain also correlates with a decrease in his ability to function. Meche's doctor noted that before the injury, generally Meche's "pain was under control with medication."[92] He took pain medication only "on an as-needed basis" and "never took medicine at work."[93] As a result, Meche was able to engage in an active lifestyle. He "lift[ed] things, . . . played baseball, walked, [and] duck hunt[ed]."[94] His doctor noted that Meche "coach[ed] his son's baseball team."[95]

---

[88]    *See* R. Doc. 12-2 at 67.
[89]    *See* R. Doc. 12-4 at 40.
[90]    R. Doc. 12-2 at 67.
[91]    *Id.*
[92]    R. Doc. 12-1 at 100.
[93]    R. Doc. 12-2 at 67.
[94]    *Id.*
[95]    *See* R. Doc. 12-2 at 99.

Meche also was able to work.[96]  According to Meche's job description, his work could include not only "sit[ing] while traveling," standing, and walking, but also "lift[ing] and/or mov[ing] up to 50 pounds in the course of demonstrating a product."[97]  Indeed, Meche attests that he was able to "move cylinders around at work . . . [and] drive 6 to 8 hours per day."[98]  He "had no trouble sitting for long periods."[99]  Meche performed such tasks at Air Liquide for over six months before his injury,[100] had worked in industrial engineering for twenty years,[101] and had been employed as an account manager in industrial sales continuously from August 2002 to August 2015.[102]

Following the injury, though, Meche has "suffered with intense uncontrollable pain . . . [and] mobility loss."[103]  He has increased his use of painkillers, including oxycodone and fentanyl, and now takes them daily.[104]  Even so, he "cannot tolerate sitting or standing for significant amounts of

---

[96]     *See* R. Doc. 12-2 at 99.
[97]     *See* R. Doc. 12-3 at 176.
[98]     R. Doc. 12-2 at 67.
[99]     *Id.*
[100]    *See id.* (Meche stating that he worked at Air Liquide "from December 2015 through July 2016").
[101]    *See* R. Doc. 12-4 at 151.
[102]    *See id.* at 153.
[103]    *See* R. Doc. 12-2 at 69.
[104]    *See id.* at 67.

time."[105]  As a result, he cannot "drive for more than 20-25 minutes."[106]

"Most of [his] time is in bed,"[107] and "many days he is barely able to get out

of bed."[108]  Unsurprisingly, "[h]e is no longer able to go duck hunting, or

participate in social activities."[109]  On one occasion, Meche required three

people to help move him following a back spasm.[110]

In sum, therefore, the changes in location, magnitude, and effect of

Meche's pain suggest that the pain does not arise from a pre-existing

condition.  And overall, the occurrence of a workplace injury, followed by

new anatomical findings, tied to different symptoms all provide evidence

that Meche's disability does not result from a pre-existing condition.

The Ninth Circuit's opinion in *Haddad v. SMG Long Term Disability

Plan*, 752 F. App'x 493 (9th Cir. 2019), provides a helpful reference point.

There, the appellate court considered a clause that precluded payment of

benefits for "a disability that is 'caused or contributed by' a preexisting

condition."  *See id.* at 494.  Specifically, the court considered whether the

pre-existing condition of a right-sided herniated disk caused or contributed

---

[105]  *See id.* at 68.
[106]  *See* R. Doc. 12-4 at 149.
[107]  *Id.*
[108]  R. Doc. 12-2 at 70.
[109]  *See id.*
[110]  *See id.*

to plaintiff's left-sided symptoms. *See id.* And the court noted that "[t]he record contains little explanation regarding the causal relationship between Haddad's preexisting right-sided condition and his new, debilitating left-sided symptoms." *Id.* The Court therefore found insufficient evidence to apply the exclusion for pre-existing conditions. *See id.* at 495.

Likewise here, the Court finds little evidence to connect plaintiff's pre-existing degenerative disc disease to his symptoms following his work-related injury. MetLife stated when denying Meche's appeal that his "conditions/pain are related to the underlying condition of multi-level degenerative disc disease and spinal canal stenosis and therefore would be considered pre-existing to [his] back pain."[111] But this analysis proves largely conclusory. It does not explain, for instance, the findings of a new bulge at a previously undiagnosed level, or the new symptoms following Meche's injury. Furthermore, MetLife's reasoning appears to suggest that any back injury Meche might suffer would be "related" to his underlying condition of degenerative disc disease and spinal stenosis. Taking this uncabined assertion to its logical extent, though, would lead to an absurd result. The Court cannot see how a back injury after, say, being hit by a bus would necessarily be caused by a pre-existing back condition.

---

[111]     R. Doc. 12-1 at 97.

Moreover, this conclusion—as stated in MetLife's letter responding to Meche's appeal—does not employ the legally operative language from the policy. As MetLife did in its initial denial letter,[112] the nurse consultant on appeal used the wrong standard.[113] MetLife states that Meche's problems are "related" to the pre-existing condition.[114] But the policy requires that the disability "results from" the pre-existing condition.[115] This distinction makes a difference. In order for a disability to "result" from a pre-existing condition, it must "be a physical, logical, or legal consequence." *Result*, *Black's Law Dictionary* (11th ed. 2019). For a disability to "relate" to a pre-existing condition, though, it need only "have some connection with" it. *Relate*, *Oxford English Dictionary* (3d ed. Dec. 2009). The language of the plan, therefore, requires a causal relationship between the pre-existing condition and the disability at issue, not a mere association. The Court does not find that this heightened standard has been met.

Indeed, at least one other court evaluating an ERISA claim has found that a patient's back injury need not result from his pre-existing degenerative disc disease. In *Smith v. Continental Casualty Co.*, 616 F. Supp. 2d 1286

---

[112]    *See* R. Doc. 12-4 at 4.
[113]    *See* R. Doc. 12-1 at 97.
[114]    *See id.*
[115]    *See id.* at 43.

(N.D. Ga. 2007), a court considered the relationship of this disease and a plaintiff's disability that arose following the misplacement of a spinal crew. *See id.* at 1290, 1298. There, the court acknowledged that the plaintiff had degenerative disc disease. *See id.* at 1290-91. But nevertheless, the court stated that "[t]he record shows, at most, that [the plaintiff's] preexisting back problems have an unknown relationship to his claimed disability." *Id.* at 1300. In particular, the court noted that the plaintiff's imaging showed no symptoms at the level of interest before the traumatic event. *See id.* at 1299. As such, the court found it possible that the plaintiff's pre-existing condition did not substantially contribute to his disability, but rather that he had "two sets of medical problems"—his "underlying back injuries" and the specific injury he later suffered. *See id.*

Likewise here, the Court finds that the evidence best comports with Meche's having two sets of medical problems. His degenerative disc disorder led to diagnostic findings and symptoms associated with the L4-5 level of his spine. But his July 20, 2016, workplace injury led to a separate injury at the L2-3 level, which had not shown up before. And it was this subsequent injury that also led to the severe symptoms—unlike those Meche had experienced before—that now disable him.

### 3. *Remaining Arguments*

In addition to the issues discussed above, plaintiff presents three further arguments in support of his claim. First, plaintiff argues in the alternative that because he went without back treatment for a continuous period of over three months—though not the three months immediately following the start of his coverage—he had a treatment-free period that would make him eligible for benefits even under the pre-existing condition provision.[116] Second, plaintiff argues in the alternative that MetLife's use of a nurse consultant to review his claim rather than a more specialized medical professional conflicts with ERISA requirements.[117] Finally, plaintiff argues that because MetLife both insures the benefits plan and awards benefits, it has a conflict of interest.[118] The Court addresses each argument in turn.

First, the Court finds that the "not received medical treatment" clause does not benefit plaintiff. The clause at issue states:

> We will pay benefits . . . for a Disability that results from a Pre-existing Condition if Your Elimination Period starts after . . . the date You . . . have not received medical treatment, consultation or services for the Pre-existing Condition **for 3 months following the date Your Disability insurance** . . . **takes effect** . . . .[119]

---

[116]    *See* R. Doc. 17 at 12-13.
[117]    *See id.* at 13-14.
[118]    *See id.* at 14.
[119]    R. Doc. 12-1 at 43 (emphasis added).

Plaintiff argues this clause means that if a participant goes without treatment for *any* three-month period, then the pre-existing condition provision does not apply.[120]  And plaintiff further avers that since he was treatment free for over four months from March 2, 2016, to July 20, 2016, the pre-existing provision does not apply to him.[121]  The Court finds, though, that the plain language of the provision refers to the ensuing three months after the insurance takes effect—here, from December 7, 2015, to March 6, 2016.

The Court's reading comports with how an average person would construe the terms of the contract.  The generally accepted meaning of "pre-existing" refers to one thing that exists before another—here, a medical condition that exists before the insurance takes effect.  Plaintiff's reading, though, would not necessarily address such pre-existing conditions.  For instance, under plaintiff's reading, even if a participant received treatment for a condition for nine months after his insurance takes effect, he could evade the application of the pre-existing provision by foregoing treatment for the next three months.  This result would be absurd, and thus is contrary to how an ordinary person would read the plan.

---

[120]     *See* R. Doc. 17 at 13.
[121]     *See id.* at 12.

Furthermore, "following" in common parlance means "[a]s a sequel to, in succession to (an event), after." *Following*, *Oxford English Dictionary* (3d ed. Dec. 2009). And the Court finds that the date three months *after* the insurance takes effect unambiguously refers to the period immediately after December 7, 2015. As such, the Court need not adopt a construction of the language biased in plaintiff's favor. *See Wegner*, 129 F.3d at 818 ("Only if the plan terms remain ambiguous after applying ordinary principles of contract interpretation are we compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor of the insured.").

Plaintiff does not contest that he received treatment for his back condition on March 2, 2016.[122] Specifically, he saw Dr. Peavy, for, among other things, chronic lower back pain, lumbar disc disease, and numbness in his left hand.[123] As such, Meche "received medical treatment, consultation or services for [his] Pre-existing Condition" during the three-month treatment-free period described in the benefits plan. Consequently, the "not received medical treatment" clause does not provide a basis for Meche's receiving benefits.

---

[122] *See* R. Doc. 17 at 12.
[123] *See* R. Doc. 12-4 at 29.

Second, the Court finds that MetLife's use of a nurse consultant does not require the Court to award benefits to Meche. In order to "provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination," 29 C.F.R. § 2560.503-1(h)(3), an ERISA plan must, among other things,

> [p]rovide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.

29 C.F.R. § 2560.503-1(h)(3)(iii).[124]

As an initial matter, the Court does not find that the MetLife nurse consultant provided a "medical judgment" that would implicate this regulation. The nurse consultant did not, for instance, "question the physicians' diagnoses." *Bess v. Mut. of Omaha Ins. Co.*, No. CIV.A. 2:11-00143, 2011 WL 5858815, at *10 (S.D.W. Va. Nov. 22, 2011); *see also Bergman v. UNUM Life Ins. Co. of Am.*, No. 3:17-CV-00245-PK, 2018 WL 3341209, at *7 (D. Or. June 14, 2018), *report and recommendation adopted*,

---

[124] Although this language appears under the "[g]roup health plans" section of the regulations, *see* 29 C.F.R. § 2560.503-1(h)(3), it also applies to "[p]lans providing disability benefits," *see* 29 C.F.R. § 2560.503-1(h)(4).

No. 3:17-CV-245-PK, 2018 WL 3340868 (D. Or. July 6, 2018) (finding that a nurse's conclusion that a plaintiff's "neck and shoulder pain fell within the preexisting condition exclusion" did not violate the regulation, when the nurse thoroughly reviewed the record and did not have to "resolv[e] a difference of opinion between two physicians").  Rather, MetLife enlisted the nurse consultant's aid to review the record and "ensure everything was considered."[125]  *See Bess*, 2011 WL 5858815, at *10 ("Inasmuch as [defendant's] denial determinations were based on a review of the objective medical records . . . , [defendant] did not run afoul of § 2560.503–1(h)(3)(iii) . . . .").

Even if the nurse consultant's opinion that plaintiff's disability related to a pre-existing condition were a medical judgment, though, the evidence does not show that the nurse consultant lacked the necessary credentials to make this assessment.  In *Bess*, for instance, the court concluded that the language of the regulation permits nurses to conduct claim reviews.  *See Bess*, 2011 WL 5858815, at *10.  Or as the Sixth Circuit concluded in *Iley v. Metropolitan Life Insurance Co.*, 261 F. App'x 860, 864 (6th Cir. 2008): "[T]his court has never held that a file review by a nurse is an insufficient form of review."

---

[125]    *See* R. Doc. 12-1 at 96.

The Sixth Circuit's related opinion in *Boone v. Liberty Life Assurance Co. of Boston*, 161 F. App'x 469 (6th Cir. 2005), is also helpful in understanding whether a nurse has the "appropriate training and experience" to review a claim like the one at issue here. In *Boone*, the nurse reviewed "x-rays, MRI, [and] doctors' notes." *Id.* at 472. Based on her review, she concluded that the plaintiff had a "whiplash injury," as well as cervical spondylosis consistent with "the normal aging process." *See id.* But she nevertheless concluded that there existed "no objective medical evidence of impairment." *Id.* As a result, the plaintiff did not receive benefits. *See id.* In assessing whether a physician should have reviewed the records, rather than a nurse, the Court did not identify any "reports and diagnoses . . . [that] would have been appreciated by a doctor but were beyond the ken of [the nurse]." *See id.* at 474. Likewise here, the Court cannot point to any material documents that, as presented in the record, would prove understandable to a doctor but not a nurse.

That said, assuming *arguendo* a violation, MetLife still adequately complied with ERISA procedures. "Challenges to ERISA procedures are evaluated under the substantial compliance standard." *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (quoting *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 539

(5th Cir. 2007)). Under this standard, the Fifth Circuit has "looked favorably upon decisions that require 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" *Id.* (quoting *Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994)).

Failing to consult a specialist can contribute to a finding that an administrator did not substantially comply with ERISA procedures. *See Lafleur*, 563 F.3d at 154-55. But the record here, taken as a whole, indicates that MetLife identified the evidence it relied upon, allowed Meche to address this evidence, and considered the evidence Meche presented. MetLife's denial letters, for example, listed numerous medical records it assessed in making its decision.[126] MetLife's letter in response to Meche's appeal also demonstrates that MetLife received and considered new evidence from Meche.[127] And MetLife engaged with these arguments, by, for example, accepting that Meche suffered a "work-related injury" and that he received "treatment . . . at various levels."[128] Overall, therefore, MetLife engaged in a

---

[126]  *See, e.g.*, R. Doc. 12-1 at 96-97; R. Doc. 12-4 at 4.
[127]  *See* R. Doc. 12-1 at 96.
[128]  *See id.* at 97

detailed review of plaintiff's claim that substantially complied with ERISA procedures.

Third, whether MetLife had a conflict of interest when reviewing plaintiff's claim has no bearing on the Court's current *de novo* review. Plaintiff takes umbrage with MetLife's "dual role" of both insuring the plan and determining whether to award benefits under the plan.[129]  But here, the Court has reviewed MetLife's decision *de novo*.[130]  Consequently, even if a conflict would trigger a "heightened standard of review"—which it does not, *see Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 n.3 (5th Cir. 2009)—the standard of review here can be heightened no further, *see, e.g.*, *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (providing illustrative options for standards of review in ERISA cases "from deferential to *de novo*").

Moreover, plaintiff stipulated to this *de novo* standard.[131]  And plaintiff concedes that "in de novo review the Court gives no deference to Metlife's decision."[132]  As such, plaintiff's argument appears targeted at atmospherics

---

[129]  *See* R. Doc. 17 at 14.
[130]  *See* R. Doc. 22 at 1.
[131]  R. Doc. 16.
[132]  R. Doc. 17 at 14.

rather than merits. The Court therefore finds that MetLife's purported conflict of interest has no bearing on the Court's review.

### 4. *Fees and Costs*

Plaintiff's complaint requests fees, costs, and interest.[133] Plaintiff clarified in his trial briefing, though, that he intends to move for fees, costs, and interest after the Court's ruling.[134] The Court will therefore address any additional award after plaintiff files such a motion.

## III. CONCLUSION

For the foregoing reasons, the Court finds that MetLife unlawfully denied Meche's long-term disability benefits. The Court therefore orders MetLife to pay Meche past and future long-term disability benefits for his July 20, 2016, back injury.

New Orleans, Louisiana, this __13th__ day of January, 2020.

*Sarah Vance*
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[133]  *See* R. Doc. 1 at 3-4.
[134]  *See* R. Doc. 17 at 15.